*In re* ROCHESTER & G. H. R. Co.

*In re* GRIEBEL *et ux.*

(*Supreme Court, General Term, Fifth Department.* October 23, 1890.)

1. EMINENT DOMAIN—RAILROAD PURPOSES.

The construction of a place for the storage of the boats of passengers visiting a watering place on the line of petitioner's railroad is not for railroad purposes, and land therefor cannot be taken under the right of eminent domain.

2. SAME—CONDEMNATION FOR DRAINAGE PURPOSES.

Land cannot be condemned for the purpose of draining an adjacent tract through it, where it appears that the owner of the land sought to be drained can construct the drains through his own land with but little less convenience, and at but little more expense than through the land sought to be condemned.

3. SAME—HIGHWAY TO HOTEL.

A railroad company cannot condemn land for the purpose of opening a highway from its road to an hotel a third of a mile distant, as the place for the entertainment of its patrons.

Appeal from special term, Monroe county.

Application by the Rochester & Glen Haven Railroad Company to acquire title to certain real estate, of which Ferdinand Griebel and Barbara Griebel and William S. Foster are the owners or persons interested therein. The matter was referred to John H. Hopkins, who on May 27, 1889, filed the following opinion:

"I, the undersigned referee, appointed in the above-entitled proceedings by an order of this court, made at a special term thereof held at the city of Rochester, N. Y., on the 30th day of January, 1889, by Hon. F. A. MACOMBER, justice of said court, having made a report to said court at the next special term thereof held in Monroe county, as directed by said order, and an order having been thereupon made at a special term of said court held at the city of Rochester, N. Y., on the 25th day of February, 1889, by Hon. WILLIAM RUMSEY, justice of said court, referring the matter back to me to take such testimony as might be produced before me upon any of the issues raised by the answer of the respondents in this proceeding, and to report said testimony, together with the facts and my opinion thereon, to this court with all convenient speed, do respectfully report:

"That I have proceeded with the hearing of said reference, and have taken the evidence produced by the respective parties, and the same is hereto annexed as a part of my report; and that, with the consent and in the company of the counsel for the respective parties, I have visited and viewed the premises sought to be acquired by the petitioner in this proceeding. Counsel for the contestants requested me to rule upon certain preliminary objections which they filed with me and also offered in evidence; but it seemed to me that the order of reference gave me no power to consider such objections, and, accordingly, I ruled that these were for the court to decide. I made the same disposition of the requests for amendment of the petition made by petitioner's counsel, and for amendment of the answer made by contestants' counsel. The evidence produced by the petitioner showed that the land was sought to be acquired for the purposes not disclosed in the petition, and counsel for the contestants' strenuously objected to the reception of evidence of this nature, and moved to strike it out after it had been received. I think that, in strictness, the position of contestants' counsel was well founded, and that the rule concerning the allegations of the petition laid down in *Re New York Cent., etc., R. Co.,* 5 Hun, 86, was applicable to a proceeding of this character. But it was my opinion that, on such a reference as this, I ought to take and report the evidence in question in order that the merits of the proceeding should be placed before the court, to the end that the court might grant an amendment of the petition if the merits of the proceeding should justify such action. The objection of contestants' counsel to the sufficing of the allegations of the pe-

tition with reference to the inability to agree for the purchase of the lands in controversy is not, I think, well taken. *In re Suburban Rapid Transit Co.*, 38 Hun, 553.

"I come now to the consideration of the merits of this proceeding, as disclosed by the evidence. The railroad which the petitioner intends to construct and operate begins at a point forty feet east of the north-east corner of East Main and Chamberlain streets, in the city of Rochester, and runs thence in a north-easterly direction to a point on the west shore of Irondequoit bay. The length of the road is a trifle over three and a half miles. At the time this proceeding was begun not more than half of the road was completed. Irondequoit bay is a beautiful sheet of water, stretching southerly from Lake Ontario, about four and a half miles, to the float bridge. It is an attractive and popular resort in summer, especially for the residents of the city of Rochester. Quite a number of steamers and steam launches ply upon it, and many sailboats and row-boats are kept and used there. There are a dozen or more hotels and restaurants along its shores. Dake's Point, where the road of the petitioner terminates, is about three and a half miles from Lake Ontario, and extends easterly into the bay. It commands a clear view of the bay for its entire length. About a third of a mile in a north-easterly direction from the Irondequoit terminus of the petitioner's road stands the Bay View House, a hotel capable of accommodating many people, but designed more especially for a 'summer hotel,' and depending for its patronage almost entirely upon visitors to the bay during the summer. Petitioner's witnesses estimate that between four hundred thousand and five hundred thousand people visit the bay during the summer, of whom about forty thousand go to the Bay View House. Along the shore of the bay, between the lands of the Bay View House and the lands of the petitioner, lies the contestants' land, a strip containing ninety hundredths of an acre, having an extent of 516 feet in a direct line, and of perhaps a hundred feet more, following the shore line. It is part of a hill covered with trees and shrubbery. Adjoining the contestants' land on the south is the land of the petitioner. It consists of fifty acres, of which a little less than half is marsh, about as much more is hill, and about six and one-half acres is solid flat land. The petitioner has a shore front of over 1,100 feet, and has constructed a dock along this shore front; but the petitioner's chief engineer testifies that this is not available for dock purposes, because more than half of it is in the swamp, a portion of the other half is on soil so soft that it will not support tracks, and only about 350 feet is on stable soil. The petitioner intends to build a pavilion, stables, and sheds and a boat-house. It expects to lay out picnic grounds, base-ball grounds, foot-ball grounds, and lawn-tennis grounds, and to lease to others the privileges for a switchback railroad, merry-go-rounds, whirligigs, etc. The chief engineer says: 'We intend to give as much land to those grounds as we can spare.' It is apparent that the petitioner has considerable land which it does not at all need for railroad purposes. But the mere fact that the petitioner has acquired land which it does not need for railroad purposes does not necessarily preclude it from acquiring additional land. It may require land for certain legitimate railroad purposes to which the land which it now possesses is not applicable, and it is upon this ground that it seeks to acquire the contestants' land.

"According to the testimony of petitioner's witnesses and the brief of petitioner's counsel, the land of contestants is required by petitioner for the following purposes: *First*, to construct a highway, with suitable sidewalks, from the railroad grounds of the petitioner to the Bay View House; *second*, to construct a breakwater to protect the existing dockage and land of the petitioner from damage by the waters of the bay; *third*, to construct a bridge over the arm of the bay which separates the Bay View property from Dake's Point; *fourth*, to construct a place for the storage of boats and yachts of passengers on petitioner's railroad; *fifth*, to construct an ice conveyor, and lay

temporary tracks upon it during the ice season in winter; *sixth*, to afford adequate drainage for petitioner's depot and hotel grounds; *seventh*, to furnish an approach to other lands owned by the petitioner.

"Most of these alleged purposes require only a very brief consideration. If a breakwater is needed, it is more to protect the land which the petitioner seeks to acquire in this proceeding than to protect the land which it already possesses. There is little if any need of a breakwater in front of contestants' land for the purpose of protecting petitioner's land. But, even if such a breakwater is needed, it does not justify the condemnation of contestants' land, lying out of water, which is described in the petition. The acquisition of a strip of land lying under water is all that the petitioner requires for that purpose. The construction of a bridge is a part of the scheme for a highway, mentioned in the first purpose, and may be disposed of with that. Moreover, the proposed bridge requires only a small part of the margin of contestants' land, which lies out of water.

"The construction of a place for the storage of boats and yachts is no part of railroad purposes. I can find no authority for the exercise of the right of eminent domain by a railroad corporation for such purpose. In *Re New York Cent.*, etc., *R. Co.*, 77 N. Y. 248, one of the purposes for which the company sought to acquire the land was for the storage of its freight. It was objected that this was not a legitimate railroad purpose. Judge MILLER says, (pages 260, 261:) 'The objection that the storing of property is one of the objects of obtaining the land sought by the petitioner is not well taken. It is not contemplated to establish the business of warehouse men, as we regard the testimony, but only a place of deposit of property after its arrival, until it can conveniently be taken by the consignee. This seems to be entirely legitimate. * * * In fact, as the liability of the company for such freight continues until actually delivered, until the consignee has a reasonable time to remove the same, it is its duty to provide accommodations for storage until this is done.' With Judge MILLER's opinion only two other judges concurred. One other concurred in the result, and three dissented. But in the present proceedings it is not claimed that the boats and yachts are part of the company's freight. On the contrary, according to the testimony of petitioner's witnesses, they will be merely conveyances for carrying the petitioner's passengers between different points on the bay and petitioner's terminus at Dake's Point. It may be added that, even if the petitioner could be permitted to acquire land for the storage of boats, it has ample facilities for that purpose in its present water frontage. The desire of the petitioner to drain its buildings through the contestants' land furnishes no basis for this proceeding. It is at best a mere question of convenience and expense; and the petitioner can drain through its own land with but little less convenience and little more expense than through contestants'. Even if it were necessary for petitioner to drain through contestants' land, such an easement might be acquired without taking the whole of that land.

"As for the claim that contestants' land is required to furnish an approach to other lands owned by the petitioner, it is sufficient to say: *First*, that these lands of petitioner can be approached from other lands which it owns just about as conveniently as by crossing contestants' land; *second*, that, if these lands are inaccessible from the east, it is due to petitioner's own act in grading so as to leave an abrupt bluff there; *third*, that these lands of petitioner here referred to consist of a wooded hill designed for picnic grounds. The owner of picnic grounds cannot resort to the right of eminent domain to secure an approach to them, simply because such owner happens to be a railroad corporation.

"It remains to consider the first and fifth of these alleged purposes for which the petitioner seeks to acquire contestants' land, viz., for a highway and for ice traffic. It is upon these that the petitioner lays the greatest stress. Mr.

Gray, the petitioner's chief engineer, says: 'The principal service to which we wish to put the proposed road-way in summer is to connect the railroad with the Bay View House, and in winter for the storage of cars in the ice business.' According to the testimony of this same witness there are not two hundred residents within a radius of a mile of petitioner's depot grounds. The passengers whom petitioner expects to carry from the bay will be, for the most part, pleasure seekers whom it has carried from Rochester to the bay, and who will go and return on the same day. A large part of these will probably wish to visit the Bay View House. To reach the Bay View House from the petitioner's terminal grounds by highway it is now necessary to follow a circuitous route more than a mile long. The petitioners might open a much shorter route, shorter even than the proposed route over contestant's land, by using part of its own lands, which are not required for railroad purposes, part of the lands of Schlitzer, the owner of the Bay View House property, who is anxious to have a highway opened, and a very small corner of the premises of Mary A. Dake. But it claims that the proposed highway is the most feasible and least expensive route from its terminal grounds to the Bay View House. This highway is still decidedly in embryo. It exists only upon paper and in the minds of the promoters, the petitioners, and the proprietor of the Bay View House. I am of the opinion that the position of the petitioners here is utterly untenable. For a railroad corporation to invoke the right of eminent domain for the purpose of opening a highway a third of a mile in extent, from its depot grounds to an hotel, even though the hotel may be a popular place for refreshment and all the patrons of the road may desire to visit it, is, I think, a novelty in proceedings of this character. If the petitioner may do this, there is no reason why it may not open highways a mile or more in extent to various other hotels and restaurants.

"As to the ice traffic, there is some force in the claim of contestants' counsel that petitioner's occupation of the proposed highway with its tracks, for a distance of seventeen hundred feet, during four months in the year, amounts practically to a change of terminus. If it may do this, why may it not lay 'temporary' tracks over the proposed highway to the Bay View House, to be used during six or seven months in the summer and fall? The case of *People* v. *Railroad Co.*, 89 N. Y. 75, and *In re New York Cent.*, *etc.*, *R. Co.*, 77 N. Y. 248, 255, do not, in my opinion, go to this length. But I pass this question to come at once to consider the necessity of petitioner's using this land to furnish facilities for the transportation of ice.

"The petitioner already has a water frontage of 1,100 feet, and the ice in front of its property is of as good quality as the ice in front of contestants' land. Indeed, it would seem as if petitioner's scheme of draining through contestants' land, if carried out, would not have an entirely purifying effect upon the ice there. It is true that not half of petitioner's water frontage is at present available; but it intends, if possible, to reclaim the rest from the marsh. It may be noticed, too, in passing, that the petitioner during four months in the year intends to occupy with its tracks the highway between its property and the Bay View House, which it proposes to open for the use of the public. But what is this ice traffic at the bay? So far it has been of very little account, though it would doubtless improve under the facilities for transportation furnished by petitioner's road. And who is to take advantage of the ice harvest? 'Anybody,' says the witness Gray, 'may harvest ice there.' Yet the petitioner in this proceeding seeks to acquire 'all the right, title, and interest, if any,' of the contestants in and to the lands under the waters of Irondequoit bay adjoining the above-described uplands. But, however this may be, the ice business is a 'collateral enterprise, remotely connected with the running or operation of the road,' and does not authorize the exercise of the right of eminent domain by the road. 'The acquisition of lands for the purpose of speculation or sale, or to prevent interference by competing lines

or methods of transportation, or in aid of collateral enterprises remotely connected with the running or operating of the road, although they may increase its revenue and business, are not such purposes as authorize the condemnation of private property. And when the corporation claims to acquire lands under a delegation of power of eminent domain, it must show express authority of law to justify the claim.' *Railroad Co.* v. *Davis*, 43 N. Y. 137, 146. 'The need of the land in aid of collateral enterprises, remotely connected with the running or operation of a railroad, will not justify an assertion of the right of eminent domain.' *In re Rochester, etc., R. Co.*, 110 N. Y. 119, 17 N. E. Rep. 678. 'It is plainly contrary to public policy that a franchise granted for public purposes should be used as a mere cover for a private enterprise.' *Fanning* v. *Osborne*, 102 N. Y. 441, 7 N. E. Rep. 307. See, also, *In re Niagara Falls & W. R. Co.*, 108 N. Y. 375, 15 N. E. Rep. 429. The cases of *New York & H. R. R. Co.* v. *Kip*, 46 N. Y. 546; *In re New York Cent., etc., R. Co.*, 77 N. Y. 248; *In re New York Cent., etc., R. Co.* v. *Metropolitan, etc., Co.*, 63 N. Y. 326; *Railroad Co.* v. *Williamson*, 91 N. Y. 552; *In re Staten Island Rapid Transit Co.*, 103 N. Y., 251, 8 N. E. Rep. 548,—furnish no authority for the taking of land by a railroad corporation for the purposes for which this land is sought to be taken. The petitioner's counsel, in his brief, adds an eighth purpose for which the petitioner requires this land, as follows: 'It is also necessary and proper that the petitioner control the whole of Dake's Point, so called, as its terminus, in order to insure the comfort and safety of its passengers.' This is undoubtedly true, and it seems to me to constitute the real reason for this proceeding, but this is no reason in law for condemnation proceedings. I think it is very unfortunate that the parties here have not come to an agreement for the purchase and sale of this land. On the one hand, this land is of much greater value to the petitioner than to any one else. On the other hand, if the petitioner does not secure this land, it can shut off the approaches to it to such an extent as to render it practically worthless to its owner. But the parties have failed to agree, and the petitioner brings this proceeding to compel the contestants to part with their lands. The purposes for which it seeks to acquire the land, according to the testimony of its own witnesses, are not, in my opinion, sufficient in law 'to justify the assertion of the right of eminent domain.' I think the application of the petitioners should be denied, with costs, without prejudice to a new application. *Railroad Co.* v. *Davis*, 43 N. Y. 137, 147."

Afterwards the matter came to be heard at special term, before Mr. Justice ADAMS, who filed an opinion as follows:

"This is a proceeding to acquire lands, under the statute, for railroad purposes. The application was resisted by the land-owners, and the issues raised by their answer were sent to a referee in order that he might take proof thereon and report the same, with the facts and his opinion, to the court. The report and opinion of the referee are now presented to the court, from which it appears that the petitioner has failed to establish to his satisfaction the allegations contained in its petition. Notwithstanding this adverse report, a motion is now made by petitioner for the appointment of commissioners, which is met by a motion on behalf of the respondents to confirm the report and dismiss the proceedings. After carefully examining the evidence in the case, as well as the reasons given by the learned referee for reaching the conclusion he does respecting the disposition to be made of the proceedings, I find myself unable to agree with him in at least one essential particular. The petition herein sets forth, among other things, that the land in question is required for the purpose of erecting and maintaining thereupon all necessary and convenient buildings, stations, fixtures, and machinery for accommodation and use of petitioner's passengers, freight, and business, and that the petitioner seeks to acquire it for that purpose. It appears by the evidence that a considerable portion of the business contemplated by the petitioner in

the building and use of its road is the transportation of ice from Irondequoit bay to the city of Rochester, and it is in part for the accommodation of this branch of its business that it deems the acquisition of respondents' land necessary.    The evidence bearing upon this question is discussed at some length by the referee, who seems impressed with the idea that petitioner designs embarking in the ice business, and that, inasmuch as such an enterprise would be collateral, etc., to the one for which the company was organized, it cannot exercise the right of eminent domain in the acquiring of respondents' land.    If it was true that this land was desired by petitioner simply to enable it to engage in the ice traffic, there would be much force in the reasoning of the learned referee, and his conclusion that such an enterprise would not justify an assertion of the right of eminent domain would undoubtedly be well founded.    *Railroad Co.* v. *Davis*, 43 N. Y. 137; *In re Rochester, etc., R. Co.*, 110 N. Y. 119, 17 N. E. Rep. 678.    But this does not appear to be what is contemplated.    On the contrary, it is for the purpose of affording proper facilities for the transportation of ice that the premises in question are desired.    This object is certainly a legitimate one, and one clearly within the proviso of the statute, under which the proceeding is instituted.    But, says the learned referee, the ice traffic at this particular locality has thus far been of very little account, and he reasons from this fact that there is no inducement for the petitioner to afford additional facilities for its accommodation.    It may be that after the land has been acquired and appliances furnished for the transportation of this very important article of merchandise, it will be demonstrated that it does not afford the anticipated profit to the company.    But for results the court is not responsible; its only concern is with the question of whether or not a reasonable necessity exists for the acquisition by the petitioner of respondents' land, and, if such a necessity exists, the prospective need of the corporation will be considered, and the exercise of reasonable discretion in the selection of lands for the accommodation of this business allowed.    *In re New York Cent., etc., R. Co.* v. *Metropolitan, etc., Co.*, 63 N. Y. 326; *In re New York Cent., etc., R. Co.*, 77 N. Y. 248.    It appears by the evidence of Mr. Gray, petitioner's principal witness, that it is the design of the corporation to use the land in question during the winter season for the storage of cars and the erection of suitable appliances for loading them with ice; that ice of exceedingly pure quality is obtained in Irondequoit bay, and that it can be harvested there easier than on the Genesee river, the main source of supply for the city of Rochester, and it is assumed from these facts that a very considerable carrying business might be done by the petitioner in this commodity.    Indeed, it is testified by Mr. Minges, one of the petitioner's directors, that the company has already had opportunities to contract for the transportation of ice over its road.    In view of the immense and constantly increasing business of this same description which other lines of railroads are notoriously engaged in, it does not seem unreasonable to conclude that the prospective needs of the petitioner will require the respondents' land in addition to that it already possesses at its northern terminus, and much of which it seems is not available for this particular purpose.    If a coal mine were awaiting development in this same locality there could be no question as to the petitioner's right to acquire all the land necessary to enable it to afford proper facilities for transporting the coal to market, even though for the lack of such facilities no one had before thought it worth while to develop the mine; and what is true of one commodity is equally true of another, for the one great object of railroad transportation is to provide facilities for bringing into market and giving value to products which without such facilities would be valueless.    For the reason herein discussed and without passing upon others tendered by the issue, it is deemed proper that the petitioners should acquire the land in question, and to that end commissioners to appraise the same will be designated by the court, unless agreed upon by counsel."

From the decision at special term contestants appeal.

Argued.before DWIGHT, P. J., and MACOMBER and CORLETT, JJ.

*Edward W. Maurer* and *J. B. Perkins,* for petitioner.   *Jacob Spahn,* for defendants.

PER CURIAM.   Order of special term reversed, with $10 costs and disburse-ments, and application denied, with costs, on the grounds stated in the opinion of the referee.

(January 24, 1891.)

PER CURIAM.   Order amended so as to read as follows:   Order of special term reversed, with costs of this appeal as in an action, and application de-nied, with costs as in an action.